UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | CASE. NO. 25-cr-133 (RDM) |
| : | |
| : | |
| TIMOTHY BROCKERMAN, : | |
| Defendant. : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully files this memorandum to aid the Court in sentencing the defendant, Timothy Brockerman. In April 2025, the defendant traveled from Virginia to the District of Columbia for the purpose of sexually abusing a 6-year-old child. For that conduct, the United States asks that the Court sentence the defendant to 120 months incarceration, followed by a lifetime of supervised release. Such a sentence, which is at the midpoint of the Defendant's Sentencing Guidelines Range, appropriately balances the factors outlined in 18 U.S.C. § 3553(a), is "sufficient, but not greater than necessary to comply with the purposes of sentencing," and will provide long-term protection to the community from potential future crimes by the defendant.

**FACTUAL AND PROCEDURAL BACKGROUND**

Leading up to April 21, 2025, an FBI Washington Field Office TFO was acting in an undercover (UC) capacity as part of the Metropolitan Police Department-Federal Bureau of Investigation (MPD-FBI) Child Exploitation Task Force, operating out of a satellite office in Washington, D.C. The UC entered a public KIK[1] group that was known to the UC as a place where people meet to discuss and trade original images and videos of children.

---

[1] KIK is a free instant messaging mobile application that allows users to communicate in a group or private chat. Users can send and receive video and image files.

Upon entering the group, the UC introduced himself and stated that he was a "dad." A member of the group using the KIK display name "Dr.BrockJr" -- who was later identified as the defendant -- initiated a private chat with the UC. During the private chat, the defendant stated, "I am not a dad. how old is your daughter?" The UC told the defendant that his purported daughter was 6 years old. The defendant told the UC that he had a sexual interest in incest, young, and beast.[2]

During the private chat with the UC, the defendant discussed the UC's purported daughter stating, "I would eat ur lil pussy make it good and wet then slid my cock in, opening ur up slow." The UC told the defendant that he resides in Washington, D.C. and that he has shared custody of his purported daughter. The defendant stated that he lives close to Herndon, Virginia. The UC observed that the defendant's Kik profile image depicted a white male wearing glasses next to a white and black cat.

During the chat, the UC asked the defendant, "what's the youngest u played with?" and the defendant responded that, when he was a minor, he previously sexually abused a family member. The defendant also stated, "when I was 7 I fucked a neighbor boy in the ass, I think he was my age."

The UC sent the defendant an image of his purported daughter.[3] The defendant told the UC that he was interested in meeting the UC at his home for purposes of engaging in sexual activity with the UC's purported daughter. Referring to the purported child, the defendant stated, "I would fuck her with a rubber," and "damn I really want to unload deep as I can inside her." Later in the chat, the defendant stated, "no I mean the first time I come over I use a rubber, second time I creampie her lil pussy." The defendant then discussed with the UC his plan to travel to the District

---

[2] "Beast" is short for "bestiality," which means having a sexual interest in animals.
[3] The image sent by the UC did not depict a real child or sexual abuse material.

of Columbia. During the conversation, the defendant inquired about parking and told the UC that he would be driving a Ford Ranger truck.

The defendant provided the UC with his mobile phone number and began texting the defendant on his mobile phone at cellular number 571-316-XXXX. During the text conversation, the defendant confirmed that he planned to travel from Virginia to the District of Columbia at approximately 11:00 a.m. on Tuesday, April 29, 2025, in order to have sexual intercourse with the UC's purported 6-year-old daughter. The defendant stated, "If I can be there earlier I will let uk… Like to have as much time as possible so she can ride my cock as long as she wants."

During the text conversation with the UC, the defendant sent the UC two photos depicting his chest and stomach, which revealed a protruding hernia. The defendant stated to the UC, "I got a hernia, looks gross to me but it don't hurt so she don't have to worry."

On April 29, 2025, the defendant traveled from his home in Virginia and met the UC at a pre-arranged location in the 500 block of H Street, N.W., in Washington, D.C., where he was placed under arrest.

Following his arrest, the defendant waived his *Miranda* rights and agreed to a voluntary custodial interview. During the interview, the defendant admitted that he traveled to the District of Columbia with the intent to engage in vaginal sexual intercourse with the 6-year-old daughter of a man he had met on a social media application. The defendant further admitted that he had previously had sexual intercourse with minors on at least two occasions, when he was also a minor.

Law enforcement seized a Motorola Moto G Pure cellular phone with serial number ZY22DLWJ7N, from the defendant when he was arrested. The phone contained four videos and four images that included child sexual abuse material, including the following:

4

- A video of a prepubescent girl wearing a bathing suit, with the bathing suit pushed to the side of the girl's vaginal area and an adult male inserting his penis in the girl's vagina.

- A nude prepubescent girl is lying on a bed with her legs up while an adult male inserts his penis in the girl's anus.

- A nude prepubescent girl is lying on a bed, and an adult woman has a penis shaped toy strapped to her waist and inserted the toy into the girl's anus.

- A nude adult male has a nude toddler girl sitting on his lap, and the man's penis is inserted into the girl's vagina.

- An image that shows a close-up of prepubescent girl's nude genitals. Adult hands are on the girl's legs and buttocks and she is being anally penetrated.

- An image which shows the face of what appears to be a prepubescent girl. The girl was shirtless with her arm covering her breasts. The girl's mouth was covered with a white substance that appears to be ejaculate.

The phone also contained one video and seven images that contained age difficult/child exploitative material.

In addition, the phone contained KIK chats and text messages between the defendant and the OCE and the device had the applications KIK and Telegram loaded onto it, with the usernames Dr.BrockJr. (Kik) and @Timmay8666 (Telegram). Finally, the device contained several chats that appeared to discuss the sexual abuse of children with other individuals including:

- A chat on KIK with user Stonedfairy111, during which the defendant discussed getting the other user pregnant and abusing their future daughters starting at age 6;

5

- A chat with user Mistybluesmith, during which the defendant stated, "if u were my daughter I wold have started fucking u at 6;"

- A chat with user Lilahhh150, during which the defendant discusses having daughters and the defendant states that when they turn 6 "they will get used like fuck toys;"

- A chat with user flannelthepup, during which the defendant states that he was tested for sex addiction in the Marine Corps and claimed that he tried therapy but "it didn't help;"

- A chat with a user who claimed to be fourteen years old. The defendant asked her if she had "a smooth pussy."

- A chat with user Autofillit123, who claimed to have an 11 year old daughter and sent a non-explicit image of a girl's face. The defendant said he "would love to fuck her and u."

- A chat with user lilrosierocker in which the defendant claims to have a "fuck buddy" who is fourteen years old.

- A chat with a user who claimed to be a 16-year-old girl. The defendant talked to her about sex and bestiality.

- A chat with user sarahbootedagain in which the defendant discussed having sex with 9-year-old children.

- In multiple chats, the defendant stated he was into "young."

On May 8, 2025, a federal grand jury indicted the defendant on one count of Travel with Intent to Engage in Illicit Sexual Conduct, in violation of 18 U.S.C. §2423(b).  On September 19, 2025, the defendant pled guilty to the sole count in the indictment.

## DISCUSSION AND RECOMMENDATION

### I.   Generally Applicable Legal Principles

In *United States v. Booker*, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in *Blakely v. Washington*, 124 S. Ct. 2531 (2004). As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory, 18 U.S.C. § 3553(b)(1).  *Booker*, 125 S. Ct. at 756.

In post-*Booker* cases, the Supreme Court has stated that a district court should begin all sentencing proceedings by correctly calculating the applicable guidelines range. *See United States v. Gall*, 552 U.S. 38, 49 (2007) ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."). After giving both parties an opportunity to argue for an appropriate sentence, the district court should then consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). *Id.* These factors include "the nature and circumstances of the offense and the history and characteristics of the defendant" (18 U.S.C. § 3553(a)(1)); the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment (18 U.S.C. § 3553(a)(2)); the kinds of sentences available (18 U.S.C. § 3553(a)(3)); the Sentencing Guidelines and related Sentencing Commission policy statements (18 U.S.C. § 3553(a)(4) and (a)(5)); the need to avoid unwarranted sentencing

7

disparities (18 U.S.C. § 3553(a)(6)); and the need to provide restitution to any victims of the offense (18 U.S.C. § 3553(a)(7)).

## II. The U.S. Sentencing Commission's 2012 and 2021 Reports on Child Pornography Offenses

In 2012 and 2021, the U.S. Sentencing Commission published reports to Congress analyzing federal sentences in both production and non-production child pornography offenses. While the instant matter is not a child pornography offense, the 2012 and 2021 reports provide helpful insight into aggravating factors that the Court should consider when issuing a sentence. The reports criticize certain enhancements in the current Guidelines and recommend three categories of aggravating factors that courts should consider when imposing sentences in non-production cases: content, community, and conduct. The Commission further explained how these factors should affect a defendant's sentence:

> The presence of aggravating factors from any of these three categories, even without the presence of any aggravating factors from the other two categories, warrants enhanced punishment depending on the degree that aggravating factors from that category are present in a particular case. The presence of aggravating factors from multiple categories generally would warrant a more severe penalty than the presence of aggravating factors from a single category.

U.S. Sent'g Comm'n, Report to Congress: Federal Child Pornography Offenses (2012) at 321 (hereinafter 2012 Report).

*Content*

As outlined in the 2012 Report, this factor directs courts to evaluate the content of an offender's collection and behavior "in terms of volume, the types of sexual conduct depicted in the images, the ages of the victims depicted, and the extent to which an offender has organized, maintained, and protected his collection over time, including through the use of sophisticated technology." 2012 Report at 320.

8

*Community*

This factor directs the Court to evaluate "the degree of an offender's engagement with other offenders — in particular, in an Internet 'community' devoted to child pornography and child sexual exploitation." 2012 Report at 320. The Commission distinguishes between impersonal file-sharing exchanges, which involve "anonymous, indiscriminate" open exchange and no two-way communication, versus "personal" distribution in closed groups, involving two-way communication concerning child pornography and child exploitation. *Id.* at 313-14, 324.

*Conduct*

The third factor asks courts to assess whether an offender "has a history of engaging in sexually abusive, exploitative, or predatory conduct in addition to his child pornography offense." 2012 Report at 320. Notably, the Commission recommends that, in addition to criminal offenses, courts consider "non-criminal acts of sexually deviant behavior" because such behavior also indicates sexual dangerousness. *Id.* at. 325.

**III.    Sentencing Guidelines Calculation**

While the government acknowledges that the PSR writer's guidelines calculation is accurate, the government believes that the Guidelines range of 108 to 135 months of incarceration is fair under the circumstances. The government will allocute within that range, in accordance with the plea agreement.

**IV.    Government's Sentencing Recommendation**

The government recommends a Guidelines sentence of 120 months of incarceration, to be followed by a lifetime of supervised release.

9

**V.      The § 3553(a) Factors Support a Sentence of 120 Months of Incarceration.**

　　A.　　<u>The Nature and Circumstances of the Offense</u>

　　The nature and circumstances of the offense support a sentence within the Sentencing Guideline's range.  The defendant's decision to travel from Virginia to the District of Columbia for the purpose of sexually abusing a six-year-old child is very serious offense which poses a significant danger to children in the community. The defendant was a member of an online Kik group dedicated to discussing the sexual abuse of children and trading CSAM. It was within this group that the defendant encountered the UC. The defendant spent days communicating online with the UC about his sexual interest in children.  He openly fantasized about having the opportunity to "… eat ur lil pussy make it good and wet then slid my cock in" and "unload deep as I can inside her."  The defendant then followed through on his expressed sexual interest in this child, driving to the District of Columbia to meet with the person who he thought would give him the opportunity to act out his fantasies.  The defendant told the UC that he wanted to have "as much time as possible" with the child.

　　Not only did the defendant choose to travel to abuse a little girl, but he also demonstrated zero concern for a child who he had every reason to believe was being abused.  The fact that the UC did not have an actual child to abuse should be of no significance in determining the defendant's sentence:  The defendant's actions demonstrate that he was willing to sexually abuse a child, and it is only happenstance that the father he reached out to online was an UC rather than someone actually offering up a child for abuse.

　　Further, the defendant's phone showed that he had similar conversations with at least ten other individuals, consistently expressing an interest in sexually abusing young children.  The defendant discussed this interest both with other adults and with users who claimed to be children.

Further, images containing child sexual abuse material or child exploitative material were found on his phone.

The defendant's online interactions with the UC and others and his decision to drive to the District of Columbia to sexually abuse a six-year-old demonstrate that he is a danger to children both online and in the physical world. The defendant's actions weigh in favor of a substantial sentence and a sentence of 120 months appropriately reflects the nature and circumstances of the offense here.

B. History and Characteristics of the Defendant

The defendant's history and characteristics also support a sentence within the Sentencing Guideline's range. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The government also acknowledges that the defendant has no criminal history. However, the evidence from the defendant's phone shows that he has engaged in a lengthy pattern of behavior to seek out CSAM and engage with other online users about his sexual interest in children. This pattern of behavior culminated in his willingness to sexually abuse a child in the real world. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████████████████████████████

████████████████████████████████

A sentence of 120 months incarceration, which is consistent with the Sentencing Guidelines, reasonably balances the defendant's history and characteristics by acknowledging the instability that he endured as a child and concerns about recidivism.

      C.      <u>The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and Provide Just Punishment for the Offense</u>

This factor is known as the "just desserts" concept, answering the need for consequences so that the punishment fits the crime, and the defendant is punished justly. *See United States v. Irey*, 612 F.3d 1160, 1206 (11th Cir. 2010). The *Irey* court cited the Senate Report regarding this provision:

> This purpose--essentially the "just desserts" concept--should be reflected clearly in all sentences; it is another way of saying that the sentence should reflect the gravity of the defendant's conduct. From the public's standpoint, the sentence should be of a type and length that will adequately reflect, among other things, the harm done or threatened by the offense, and the public interest in preventing a recurrence of the offense. (quoting S.Rep. No. 98-225, at 75-76, 1984 U.S.C.C.A.N. 3258-59).

*Id.*

The sexual abuse of minors is a serious offense that can have detrimental effects on victims in both the short and long term. While the defendant's conduct did not involve the actual abuse of a child, that was only because his efforts were thwarted by an undercover officer. The defendant certainly did everything he could possibly do to attempt to abuse a six-year-old child. An appropriate sentence in this case should account not only for the conduct the defendant actually engaged in, but for the conduct he was clearly intending to engage in when he traveled to the District of Columbia to meet someone whom he believed could provide him with an opportunity to abuse a child.

D. <u>The Need for the Sentence Imposed to Afford Adequate Deterrence and to Protect the Public from Further Crimes of the Defendant</u>

Congress, the Supreme Court, and the Sentencing Commission believe general deterrence is a very important factor when considering an appropriate sentence. *See United States v. Fry*, 851 F.3d 1329, 1332 (D.C. Cir. 2017) (the sentence would deter Fry and "others who may be inclined in doing similar kinds of things."). Here, deterrence of the defendant and others is particularly important where the conduct was not a product of a one-time lapse in judgement. In connection with a community of likeminded individuals, the defendant nurtured and fed his own fantasies involving children. The defendant's phone showed that he was communicating with numerous people about his sexual fantasies about children. The Court's sentence must account for the fact that there are entire online communities of people excited by paraphilic fantasies (e.g., involving minors or violence) who must be deterred from acting on those impulses. Here, a sentence of 120 months incarceration is a reasonable way in which to deter individuals with a sexual interest in children, including the defendant, from acting on that interest and potentially harming a child.

E. <u>Kinds of Sentences Available and the Need to Avoid Unwarranted Sentencing Disparities</u>

Section 3553(a)(6) requires courts to consider the need to avoid unwarranted sentencing disparities among defendants "with similar records who have been found guilty of similar conduct." However, it "does not require the district court to avoid sentencing disparities between [ ]defendants who might not be similarly situated." *United States v. Mattea*, 895 F.3d 762, 768 (D.C. Cir. 2018) (quoting *United States v. Guillermo Balleza*, 613 F.3d 432, 435 (5th Cir. 2010).

Here, the U.S. Sentencing Commission's Judicial Sentencing Information shows that the average sentence length for individuals sentenced under U.S.S.G. § 2G1.3 with a final offense

13

level of 31 and Criminal History Category I was 120 months during Fiscal Years 2020—2024. The median sentence length was 120 months. Therefore, the government's requested sentence is appropriate.

## CONCLUSION

For the foregoing reasons, the government respectfully recommends that the defendant be sentenced to a term of incarceration of 120 months, followed by a lifetime of supervised release. Such a sentence contemplates not only the relevant guidelines range set forth for this offense, but also adequately reflects the factors as outlined in 18 U.S.C. § 3553(a).

        Respectfully submitted,

        JEANINE FERRIS PIRRO
        UNITED STATES ATTORNEY

        */s/ Rachel Bohlen*
        Rachel Bohlen
        DC Bar No. 1010981
        Assistant United States Attorney
        601 D St NW
        Washington, DC 20530
        (202) 805-3575
        rachel.bohlen@usdoj.gov